

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-13-2007

# Macharashvili v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-1363

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Macharashvili v. Atty Gen USA" (2007). *2007 Decisions.* Paper 951.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/951

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 06-1363

———————

MERAB MACHARASHVILI,
                              Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES;
SECRETARY OF DEPARTMENT OF HOMELAND SECURITY,
                              Respondents

———————

PETITION FOR REVIEW OF A DECISION OF
THE BOARD OF IMMIGRATION APPEALS
Agency No. A79-299-156
Immigration Judge: Miriam K. Mills

———————

Submitted Under Third Circuit LAR 34.1(a)
May 21, 2007

———————

Before: BARRY, CHAGARES, and TASHIMA,[*] Circuit Judges

(Opinion Filed: June 13, 2007)

———————

OPINION

———————

———————

[*] The Honorable A. Wallace Tashima, Senior Circuit Judge, United States Court of
Appeals for the Ninth Circuit, sitting by designation.

BARRY, Circuit Judge

Merab Macharashvili petitions for review of an order of the Board of Immigration Appeals ("BIA") upholding the Immigration Judge's ("IJ") denial of asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). We will deny the petition.

**I.**

Macharashvili is a citizen and native of Georgia who entered the United States, via Mexico, on February 23, 2000. On February 20, 2001, he applied for asylum, withholding of removal, and CAT protection. He alleged, as the basis for relief, his Ossetian nationality and his outspoken opposition to the Georgian nationalist policies of then-President Eduard Shevardnadze. An asylum interview was conducted on March 20, 2001. The asylum officer determined that Macharashvili's application was timely, but that he was ineligible for asylum because his testimony lacked credibility and failed to describe acts rising to the level of persecution. The matter was referred to an IJ for a hearing.

An IJ held hearings on March 11, 2002 and April 16, 2002, and Macharashvili testified with the aid of Russian and Georgian translators, respectively. He testified that he is half Ossetian and half Georgian, and that his wife is Georgian. He claimed that after fighting broke out in Ossetia in 1991 and he began to criticize the nationalist policies of President Shevardnadze, he was frequently persecuted because of his nationality and political views. Specifically, he testified, he lost his job on three occasions between 1995

2

and 1998, was assaulted twice, and received threatening phone calls. Although he sought help from the police, he claimed that they refused to investigate because he was Ossetian. In December 1996, he stated, he and his wife moved to the region known as South Ossetia, where he continued to be persecuted because of his wife's Georgian nationality. In July 1997, he moved to Moscow while his wife remained in Georgia. After the Chechen war broke out in 1998, he claimed that he was persecuted for being from the Caucasus region, and for not having proper identification. He stated that he returned to his wife in August 1999, but after learning that he was still in danger, he obtained a Mexican visa and "took off to Mexico." (App. vol. II at 173-74.) His wife and two children, both daughters, purportedly remain in Georgia.

At the conclusion of the April 16, 2002 hearing, the IJ made an adverse credibility determination and denied relief. On appeal, the BIA found the IJ's findings speculative and remanded for further findings consistent with Third Circuit caselaw. The BIA specifically instructed the IJ to permit the parties to present evidence regarding current country conditions, and to afford Macharashvili the opportunity to explain any discrepancies in his testimony.

On remand, the matter was assigned to a new IJ, who, on February 20, 2004, held a new hearing. The government submitted evidence of a change of political leadership in Georgia following the resignation of President Shevardnadze in November 2003 and the election of a new president in January 2004. Macharashvili again testified with the aid of a Georgian interpreter. At the end of the hearing, the IJ denied relief, finding

3

Macharashvili's claim not credible. She specifically cited his failure to provide reliable proof of his Ossetian nationality, his lack of any independent corroboration from his wife, and his inability to provide credible explanations for his lack of proof.

Macharashvili appealed to the BIA, which, on December 27, 2005, issued a detailed opinion affirming the IJ's findings and denial of relief. The BIA found, based on its independent review of the record, that a negative credibility finding was warranted. It noted, specifically, that Macharashvili had submitted insufficient documentation of his nationality and no corroborative evidence from his wife with respect to the claimed incidents of persecution. The BIA also cited evidence in the record that political conditions in Georgia changed after the 2004 presidential elections, and found that Macharashvili had been afforded an opportunity to address each of these concerns. This petition followed.

## II.

We have jurisdiction to review a final order of removal pursuant to 8 U.S.C. § 1252, and we review adverse credibility determinations of the IJ or BIA for substantial evidence. *Chen v. Ashcroft*, 376 F.3d 215, 221-22 (3d Cir. 2004). The BIA performed an independent review of the record, but also relied substantially on the IJ's "specific, cogent reasons for her adverse credibility finding." (App. vol. I at 6.) Accordingly, we review both the IJ and BIA's opinions. *Xie v. Ashcroft*, 359 F.3d 239, 242 (3d Cir. 2004). We must uphold the BIA and IJ's adverse credibility determination unless the evidence of Macharashvili's credibility is so strong "that in a civil trial he would be entitled to

4

judgment on the credibility issue as a matter of law." *Chen*, 376 F.3d at 222.

There is substantial evidence in the record to support the findings of the IJ and the BIA that Macharashvili lacked credibility, particularly as it relates to the question of his Ossetian nationality. At the heart of his claim is his assertion that he is "half Ossetian"—a fact that allegedly resulted in his being persecuted at the hands of Georgian nationalists, but that fails to withstand scrutiny. He testified that he was born in Georgia and speaks only Georgian, having not learned the Ossetian language either in his youth or during the period when he and his wife resided in South Ossetia. His father, also born in Georgia, is himself "half Ossetian," while his mother is Georgian; and his paternal grandfather is "half Ossetian." (App. vol. I at 57.) These ratios, it must be noted, would make Macharashvili no more than one quarter Ossetian. He conceded that he has a Georgian last name, but maintained that "everyone" in Georgia knows that it is derived from Ossetian. (*Id.* at 42.) Yet, from 1985 to 1995, he was a star performer in the Georgian National Dance Company, and was fired in 1995, four years after fighting broke out between Georgian and Ossetian nationalists, allegedly because he refused to join the Georgian Citizens Union. He acknowledged that union leaders wanted him to join.

We agree with the IJ and the BIA that these circumstances cast considerable doubt on Macharashvili's Ossetian identity, and raise the need for corroboration. *See In re Y-B*, 21 I. & N. Dec. 1136, 1139 (BIA 1998) ("[T]he weaker an alien's testimony, the greater the need for corroborative evidence."). Corroboration here, however, is virtually nonexistent. Despite having had three years to gather documentary support for his claim,

the only evidence that Macharashvili has produced of his Ossetian identity is his father's reissued, unauthenticated birth certificate, showing "Ossetian" as the nationality of his paternal grandfather.[1] Macharashvili testified that in Georgia, ethnic identity is derived from one's father, but he has produced nothing to substantiate this claim, nor to corroborate his assertion that "everyone" in Georgia knows Macharashvili is an Ossetian name. *See* 8 C.F.R. § 208.13(a) (placing burden of proving eligibility for asylum and withholding on applicant); *Obale v. Attorney Gen.*, 453 F.3d 151, 163 (3d Cir. 2006) (acknowledging the applicant's burden to produce corroborating evidence).

Meanwhile, Macharashvili has failed to produce a copy of his own birth certificate or those of his children, and has failed to produce a copy of his marriage certificate—all documents that might corroborate his nationality. Even more troublesome, he has failed to produce any corroborating affidavits from friends or family members. He contends that he cannot contact his parents, and that his wife is afraid to use the mails, but we find such justifications unpersuasive in light of the fact that his wife and parents, who reside some 150 kilometers apart, are not subject to the same intrusive local authorities, and that, in any event, he has had several years to make alternative arrangements. The absence of any affidavit from his wife is all the more glaring in light of her central role in Macharashvili's narrative as the sole eyewitness to many of the alleged acts of

---

[1] Although certification pursuant to 8 C.F.R. § 287.6 is not strictly required, *see Liu v. Ashcroft*, 372 F.3d 529, 533 (3d Cir. 2004), we note that Macharashvili offers no explanation for the lack of certification here, and attempts to prove the birth certificate's authenticity "through other means," *id.*

persecution, and as the ostensible reason for his being targeted for persecution in South Ossetia. *See Zhang v. I.N.S.*, 386 F.3d 66, 78-79 (2d Cir. 2004) (faulting petitioner for failing to obtain corroborative affidavit from wife or credibly demonstrate that such affidavit was unavailable).

Macharashvili's testimony is implausible in other respects, as well. He conceded that ethnic conflict between Georgians and Ossetians reached its peak in 1991, but that he was not fired from his job until 1995, the year when State Department reports indicate that conditions began to stabilize. At his first asylum hearing, he admitted that he experienced no incidents of persecution during the year prior to his departure for Mexico, and no physical violence since 1996. His wife and daughters admittedly have suffered no persecution in his absence, and he is unaware of any persecution experienced by his "half Ossetian" father and Georgian mother, who continue to reside together in Georgia. *See Lie v. Ashcroft*, 396 F.3d 530, 537 (3d Cir. 2005) (noting that a petitioner's claim may be diminished or undercut when family members remain in petitioner's native country without suffering harm). It is also noteworthy that President Shevardnadze is no longer in office, and that early reports indicate that "[c]onsiderable progress has been made in negotiations on the Ossetian-Georgian conflict." (App. vol. II at 259.) Finally, we struggle, as did the IJ, with Macharashvili's somewhat incredible story of his South Ossetian neighbors learning the ethnic identity of his wife from his one-year, seven-month-old daughter, who allegedly told them her mother's last name.

The scant corroborating evidence that Macharashvili has provided is, at best,

inconclusive. He has submitted a copy of his passport, indicating that he is a citizen of the Republic of Georgia, and a letter from Lufthansa, indicating that he was a passenger aboard a February 13, 2000 flight. Neither fact is contested. He has submitted a photograph and a certificate from the Georgian Ministry of Culture, issued on April 24, 2001, indicating that he was a member of the State Honored Folk Song and Dancing Troupe of Georgia from December 16, 1985 until November 12, 1995; this fact is also uncontested. Most relevant to his claim of past persecution is an uncertified extract from his official Medical Card, issued on February 1, 2001, indicating that he "got trauma" and was treated on May 10, 1996. Although this document is consistent with his claim that he was assaulted on that date by Georgian nationalists, there is no indication of the cause of the trauma or of Macharashvili's nationality, and, therefore, nothing to corroborate his claim that this was an act of state-condoned ethnic persecution. Meanwhile, he has submitted no evidence that he continues to be, or ever was, wanted by the Georgian authorities for speaking out against the policies of former President Shevardnadze—or, for that matter, for any reason.

In light of these circumstances, we conclude that there is substantial evidence in the record to support the IJ and BIA's adverse credibility finding. Despite having had ample time to do so, Macharashvili has failed to produce any evidence to corroborate the more problematic and less credible aspects of his testimony, such as his alleged Ossetian nationality, his marital status, and his blacklisting by Georgian authorities. As these aspects go to the heart of his claim for asylum and withholding of removal, *see Gabuniya*

8

*v. Attorney Gen.*, 463 F.3d 316, 321 (3d Cir. 2006), we find substantial evidence supporting the IJ and BIA's denial of relief.

## III.

For the foregoing reasons, we will deny Macharashvili's petition for review of the order of the BIA denying him asylum, withholding of removal, and relief under the CAT.